IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    Case No. 1:19-cr-00454-MC

                                             OPINION & ORDER

       Plaintiff,

v.

GREGORY LEE RODVELT,

       Defendant.

_____

**MCSHANE, District Judge:**

On September 7, 2018, a federal agent was injured by an explosive device when he entered a home that had at one time been the residence of the defendant, Gregory Rodvelt. The defendant was eventually indicted in October of 2019 on charges of Assault on a Federal Officer, Using and Discharging a Firearm During a Crime of Violence, and Unlawful Possession of a Destructive Device. Defendant now moves to dismiss the indictment against him based on the Government's alleged four-and-a-half-year delay in bringing him to trial. Because Defendant's statutory and constitutional rights to a speedy trial were not violated, the Motion to Dismiss (ECF No. 40) is denied.

## BACKGROUND

In April of 2017, Defendant was indicted on unrelated state charges in Arizona. Def.'s Mot. 4; ECF No. 40. While living in Arizona on pretrial release, the state court granted him permission to travel to Oregon to contest a foreclosure matter on property defendant claimed

1 – ORDER

ownership. Def.'s Mot. 4. Defendant, however, was unable to get to Oregon in time for the hearing and the Oregon court, in the Defendant's absence, appointed a receiver to sell the property on August 22, 2018. Def.'s Mot. 4. The Government alleges that before returning to Arizona, Defendant booby trapped the property with the explosive devices that underly the indictment here. Govt.'s Resp. 2; ECF No. 44.

On September 7, 2018, the property receiver and a private investigator visited the property. Govt.'s Resp. 5; Def.'s Mot. 4–5. They called the police after noticing a sign "warning visitors that the house was protected by improvised munitions." Govt.'s Resp. 5. The Oregon State Police bomb squad and an FBI bomb technician arrived. Def.'s Mot. 5. While inspecting the property, law enforcement agents found several booby traps including a hot tub rigged to roll downhill—which Defendant later allegedly described to an FBI agent by referencing the rolling stone from the movie Indiana Jones. Govt.'s Resp. 2; Def.'s Mot. 60, 63. Because the house on the property had bars securing it from the inside:

> [a]gents used an explosive charge to breach the front door. While entering, one of them moved a wheelchair which triggered a trap. There was an explosion as a .410 shotgun shell discharged and hit an FBI agent in his lower leg. The agent was taken to the hospital and an X-ray showed a foreign object shaped like a pellet embedded in his left leg below the knee.

Govt.'s Resp. 2–3. The agent was released from the hospital the same day. Def.'s Mot. 6.

Later that day, FBI agents in Arizona interviewed Defendant about the incident at the Oregon property. Def.'s Mot. 6. The FBI also began coordinating with local law enforcement— Maricopa County Sheriff's Office ("MCSO")—to arrest Defendant and have his bond revoked in state court. Def.'s Mot. 6 The FBI indicated in an internal email that it wanted MCSO to make an "arrest for pretrial violation in lieu of waiting for [a federal] arrest warrant." Def.'s Mot. 7, 88. After being notified of the Oregon incident, the Maricopa County Attorney's Office requested,

and was issued, a state warrant for Defendant's violation of his pretrial release. Govt.'s Resp. 3; *See* Govt. Ex. 1 (request for warrant) and Govt. Ex. 2 (pretrial warrant).

On September 8, 2018, Defendant was collecting lizards in the desert when he was arrested by a joint task force made up of several FBI agents and two MCSO law enforcement officers. Evid. Hear. 94–95, 126, ECF No. 64. The FBI agents questioned Defendant and then turned him over to an MCSO Detective, who made the arrest based on the state warrant. Evid. Hear. 102–03. An MCSO deputy transported Defendant to the Maricopa County jail where defendant was booked on his state charges. Evid. Hear. 95–96. Defendant was released the next day (September 9, 2018) and an Arizona prosecutor filed a motion to revoke Defendant's pretrial release based on the Oregon property incident. Govt.'s Resp. 3; *See* Govt. Ex. 4. On September 10, 2018, a federal criminal complaint and arrest warrant were issued, charging Defendant with assaulting a federal officer. Govt.'s Resp. 3. Due to safety concerns relating to the location of Defendant's residence, rather than arresting him that night, the FBI chose to wait until his court appearance the following morning.[1] Evid. Hear. 130–31.

On September 11, 2018, Defendant appeared in state court for a final pretrial hearing in his state case. Govt.'s Resp. 3. Because of the incident at the Oregon property, the state's attorney moved to revoke Defendant's bond for violation of the pretrial release. Govt.'s Resp. 3. Having heard about the Oregon incident, the state judge decided to hold Defendant as nonbondable. Bond Hear. 21, ECF No. 56–2. An FBI Agent notified the court of the federal arrest warrant and stated that if the state did not take Defendant into custody, then he intended to take Defendant into federal custody. Bond Hear. 22. When presented with the choice of going into state or

---

[1] The Court finds the officers' testimony credible. Given the nature of the Oregon incident, and the fact that the booby trap injured an officer while in the line of duty, the officers understandably viewed Defendant as a threat and sought to take Defendant into custody. The officers did not care whether Defendant was taken in on state or federal charges, only that Defendant was taken into custody. Again, the Court finds the officers' testimony credible.

federal custody, Defendant said he "would rather take care of this case first and then deal with

the federal case second." Bond Hear. 24–25. However, after speaking with advisory counsel,

Defendant told the judge that he preferred to be taken into federal custody. Bond Hear. 26. The

judge responded that she was "open to whatever is workable between the federal and the state

government." Bond Hear. 26. The state trial had been pending for about nine months and was set

to begin the following day. Evid. Hear. 193; Bond Hear. 31. At the state's request, the judge

decided to proceed with the state trial first. Bond Hear. 26. Defendant was then placed into state

custody. Bond Hear. 26–27. Defendant proceeded to trial for his state charges and was ultimately

sentenced to five years of imprisonment on November 8, 2018. Govt.'s Resp. 5.

Meanwhile, the Government continued its investigation into the Oregon incident.

Govt.'s Resp. 5. Special Agent Gray testified that in his twenty-eight-year career with the

FBI, this was only the second time that he had encountered improvised explosive devices.

Evid. Hear. 27. And when Special Agent Gluesemkamp took over the role of lead

investigator in July 2019, following Special Agent Gray's retirement, he conducted a

comprehensive review and identified additional areas in need of investigation. Evid.

Hear. 66–68. On October 2, 2019, the Government indicted Defendant for assaulting a

federal officer. ECF No. 8. The investigation continued after the indictment.[2] Evid. Hear.

71–72.

On December 30, 2019, The Government sent a detainer notice to the Arizona

Department of Corrections, where Defendant was imprisoned, and requested that Defendant be

notified of the federal charges and his right to demand trial. Evid. Hear 73; *see* Govt. Ex. 11

---

[2] Defendant relies heavily on Special Agent Gray's belief that no further investigation was necessary. Ultimately, the prosecutor makes the decision on when to file charges and what case requires additional investigation. The evidence indicates that despite Special Agent Gray's desire to proceed full steam ahead, the prosecutors believed it wise to have the ATF examine the explosive device and investigate further.

(detainer request). However, the paperwork was not served until April 8, 2020, after the Government's second request. Evid. Hear. 11, 74. Defendant testified that Corrections Officer Kaylor presented the paperwork from about six feet away, notified him that it related to new charges, and told him that there was a federal indictment against him. Evid. Hear. 178—81. Defendant knew that the paperwork related to the Oregon incident but did not attempt to read the paperwork nor did he ask Corrections Officer Kaylor to read it to him. Evid. Hear. 186. He refused to sign without counsel. Evid. Hear. 195. Despite having successfully requested Corrections Officer Kaylor's assistance in obtaining counsel in the past, Defendant chose not to inquire further about the contents of the paperwork or obtaining counsel. Evid. Hear. 187–88. Corrections Officer Kaylor testified that he provided Defendant with a copy of the document and took it back after Defendant refused to sign. Evid. Hear 13. Officer Kaylor's testimony is credible and supported by the record. The record established that Officer Kaylor repeatedly assisted Defendant in the past, including on two occasions where Defendant requested to speak with an attorney. The paperwork was sent back to the Government, indicating that Defendant was presented the paperwork and refused to sign. Govt.'s Resp. 6; Evid. Hear. 13. Because Defendant was subject to a felony detainer, he was moved to a higher level of security and lost his work privileges.[3] Evid. Hear 11, 171.

---

[3] In contrast to Officer Kaylor's testimony, Defendant's testimony was less-than credible. As but one example, Defendant argued that he was placed in the "hole" in retaliation for refusing to speak with federal agents. In response to the Court's request for additional documentation on this issue, the Government submitted a declaration from Sarah Greener, an employee of the Arizona Department of Corrections. Greener Decl. ECF No. 66. The declaration states that Defendant was transferred not out of retaliation, but in response to Defendant's own report "that he had been threatened and requested protection." Greener Decl. ¶ 5. Additionally, given Officer Kaylor's testimony, along with numerous instances of assisting Defendant in the past, the Court finds Defendant's testimony that Officer Kaylor attempted to block Defendant's ability to view the paperwork not credible. Instead, Defendant simply chose not to read the paperwork or inquire further. Greener's declaration indicates the detainer was placed in Defendant's file, "where he could have seen it if he had requested to do so." Greener Decl. ¶ 3. Again, the Court finds Defendant's testimony that prison staff prohibited him from reading the detainer, or retaliated against him for not signing it, not credible.

On December 20 2021, a writ of habeus corpus *ad prosequendum* was issued and Defendant was brought to Oregon; he made his first federal court appearance on February 22, 2022. Def.'s Mot. 12. He remained in federal custody while serving out his state sentence. Govt.'s Resp. 6. On April 14, 2022, defense counsel asked for a continuance to prepare for the present motion. Def.'s Mot. 24. This Court held an evidentiary hearing on November 1, 2022. Evid. Hear. ECF No. 64. Six witnesses testified, including Defendant, the Corrections Officer that presented the federal detainer to Defendant, as well as state and federal law enforcement officers involved with the investigation and arrest of Defendant. *See* Evid. Hear. ECF No. 64. Defendant also presented evidence on an *ex parte* basis regarding the existence and exculpatory nature of the evidence allegedly destroyed due to the Government's delay.

## DISCUSSION

Defendant moves to dismiss the indictment because the delays in bringing him to trial allegedly violated his rights under the Speedy Trial Act ("STA") 18 U.S.C. § 3161 *et seq.*, the Interstate Agreement on Detainers Act ("IAD") 18 U.S.C. App. §2, art. III(c), and the Speedy Trial Clause of the Sixth Amendment of the U.S. Constitution. The Government denies that Defendant's constitutional or statutory rights were violated. The Court first addresses Defendant's statutory claims followed by the constitutional claim.

## I.    Speedy Trial Act 18 U.S.C. § 3161 *et seq.*

Under the STA, the government must indict an individual within 30 days of making a federal arrest. 18 U.S.C. § 3161(b). After the defendant's indictment or court appearance, whichever is later, the government has 70 days to bring him to trial. § 3161(c)(1). Failure to

bring a defendant to trial within the specified STA time period warrants dismissal of the indictment. *United States v. Benitez*, 34 F.3d 1489, 1493 (9th Cir. 1994); 18 U.S.C. § 3162(a)(1).

### A. Federal Arrests Under the Speedy Trial Act

The STA is only triggered by a federal arrest. *United States v. Redmond*, 803 F.2d 438, 440 n.7 (9th Cir. 1986). A federal arrest is the detention of the defendant pursuant to federal charges. *United States v. Cordova*, 537 F.2d 1073, 1076 (9th Cir. 1976). "[T]he Speedy Trial Act is not triggered when a defendant is arrested by federal authorities and immediately released or turned over to state authorities and charged with state law violations." *Benitez*, 34 F.3d at 1494. That said, the STA may be triggered when the collusion of state and federal authorities is a mere "ruse to detain the defendant *solely* for the purpose of bypassing the requirements of the [STA]." *Id.* (emphasis added) However, the so-called "ruse exception" does not apply when state authorities detain the defendant for a reason "completely independent of the potential federal basis for prosecuting him." *United States v. Kelley*, 40 F.4th 276, 283–84 (5th Cir. 2022) (noting 5th circuit's adoption of the 9th circuit's ruse exception as explained in *United States v. Cepeda-Luna*, 989 F.2d 353, 357 (9th Cir. 1993)). When there is a reason for the detention that is independent of the federal charges, to prove the ruse exception, the defendant must show that the arresting authorities acted in bad faith. *Kelley*, 40 F.4th at 284.

Here, Defendant's September 8, 2018 arrest was not a federal arrest because no federal charges were filed. Defendant was taken into custody by MCSO, detained in a Maricopa County jail, and charged with violation of his pretrial release. Defendant compares his case to *Benitez*, where the court described the cooperation between federal and state authorities as "very close" to a ruse. Def.'s Mot. 34; *citing Benitez*, 34 F.3d at 1494. There, federal agents physically restrained the defendants and then called 911 for assistance from local law

enforcement, who then took the defendants into state custody. *Benitez*, 34 F.3d at 1492. The state brought charges but because a federal investigation involving undercover federal agents was still underway, the complaint was dismissed after the undercover agents, who were necessary witnesses, failed to appear at the state hearing. *Id.* at 1492. The state then filed a new complaint and scheduled another hearing but when the U.S. Attorney's Office notified the state that it was now ready to seek a federal indictment, the state dropped its charges. *Id.* The level of coordination between the state and federal authorities in making the arrest was not the issue; rather, *Benitiz* was "very close" to a ruse because the state dropped its charges once the U.S. Attorney's Office was ready to prosecute. *Id.* at 1494–95. Nonetheless, the court affirmed the denial of the motion to dismiss, holding the state arrest was not a ruse used *solely* to stall the triggering of the STA. *Id.* at 1495.

In contrast with *Benetiz*, here, Arizona did not drop its charges once the Government was ready to proceed. Rather, Arizona charged Defendant for violation of his pretrial release, a state hearing was held, and his bond was revoked. Although the FBI directed the MCSO in a coordinated effort, the arrest was not a ruse.[4] Whether the purpose of the FBI's coordination of the joint task force in arresting Defendant was to further a federal investigation is not determinative. Given the seriousness of the alleged incident in Oregon, Arizona had a legitimate and independent grounds for arresting Defendant. Defendant has not shown that the Government acted in bad faith, which is necessary to show a ruse when the state has an independent reason for the arrest. Because Defendant was charged for violation of his pretrial

---

[4] Defense counsel cites *Colorado v. Nord*, 377 F. Supp. 2d 945, 949 (D. Colo. 2005), for the proposition that "[c]ourts have consistently treated local law enforcement agents deputized as federal agents and acting as part of a federal task force as federal agents." However, *Nord* addressed whether local law enforcement agents deputized as part of a federal task force are entitled to federal sovereign immunity. *Id. Nord* has little to do with the meaning of a federal arrest for purposes of the STA.

release resulting in the revocation of his bond, the arrest was not a ruse used solely for the purpose of bypassing the requirements of the STA. In short, the September 8, 2018 arrest did not trigger the STA.[5]

### B.  Post Indictment Requirements of the Speedy Trial Act

Defendant's arguments for dismissal based on the Government's post indictment conduct also fail. First, the Government did not violate § 3161(c)(1) of the STA by failing to bring Defendant to trial within 70 days of the federal indictment. The speedy trial clock is triggered by the defendant's indictment or court appearance, "whichever date last occurs." § 3161(c)(1). Defendant's argument—that the October 2, 2019 indictment started the 70 day clock even though Defendant did not appear before the Court until February 22, 2022—is clearly refuted by the plain language of the statute. Because Defendant tolled the speedy trial clock, by requesting multiple continuances starting on April 14, 2022, the Government has not failed to bring Defendant to trial within 70 days of his court appearance.

Second, the Government's failure to promptly file a detainer following the indictment is not grounds for dismissal. Under §3161(j)(1), when the attorney for the government knows that a person charged with a federal offense is serving a term of imprisonment, she must either (1) undertake to obtain the prisoner for trial (such as requesting a court to issue a writ of habeas corpus *ad prosequendum*), or (2) issue a detainer on the prisoner. 18 U.S.C. § 3161(j)(1)(A)–(B). A person is "charged with an offense" when an indictment is filed against him. *United States v. Tenijieth*, 35 F.3d 573 (9th Cir. 1994) (unpublished, internal quotation marks and citations

---

[5] Defendant conceded at the evidentiary hearing that being taken into state custody at the September 11, 2018, revocation of bond hearing was not a federal arrest. Evid. Hear. 198 ("We are not contesting, in any way, that the [September 11, 2018] state court prosecution was a ruse. We're contesting that the [September 8, 2018] arrest conducted in the desert was a ruse."). Having reviewed the record, the Court agrees that the September 11, 2018 arrest was not a federal arrest.

omitted). If the government chooses to file a detainer, it must promptly request that the imprisoner give the person notice of the detainer and advise him on his right to demand a trial. 18 U.S.C. § 3161(j)(1)(B). By indicting Defendant on October 2, 2019 and waiting until December 30, 2019 to file the detainer, the Government violated § 3161(j)(1).[6] However, this point is moot because "[t]he language of the Speedy Trial Act clearly dictates that dismissal of an indictment is not a remedy for a violation of § 3161(j)(1)."[7] *United States v. Valentine*, 783 F.2d 1413, 1415 (9th Cir. 1986) (footnote omitted).

Last, dismissal is not warranted based on Arizona DOC's failure to promptly notify Defendant of the detainer and his right to demand trial. Following an indictment of a person serving a term of imprisonment, if the government chooses to file a detainer, then the imprisoner is required to "promptly advise the prisoner of the charge and of their right to demand trial." 18 U.S.C. § 3161(j)(2). The filing of the detainer on an imprisoned person also triggers the notice requirement of the Interstate Agreement on Detainers Act ("IAD") 18 U.S.C. App. §2, art. III(c). *United States v. Mauro*, 436 U.S. 340, 351 (1978) ("The warden of the institution in which the prisoner is incarcerated is required to inform him promptly of the source and contents of any detainer lodged against him and of his right to request final disposition of the charges."). However, while the STA "provides for the sanction of dismissal of the indictment for certain specified substantive violations of the Act, it does not provide for the sanction of dismissal for violation of section 3161(j)." *United States v. Stoner*, 799 F.2d 1253, 1257 (9th Cir. 1986)

---

[6] The Court finds that this delay was due not to bad faith, but by Special Agent Gluesenkamp's unfamiliarity with the process of lodging a detainer. Special Agent Gluesenkamp testified that he had never previously placed a detainer on an individual already sentenced by a state court. Evid. Hear. 70. Poor communication also led to the delay. But based on the testimony, this delay was clearly not an instance of bad faith on the part of the Government.
[7] If Defendant seeks vindication for the alleged violation of this right outside of dismissal of the indictment, "the Act makes available a number of disciplinary sanctions against the government attorney for violation of any of the Act's substantive provisions." *United States v. Stoner*, 799 F.2d 1253, 1257 (9th Cir. 1986). The Court takes no position at this time on whether any disciplinary sanction is warranted. Instead, the Court merely notes that dismissal is not an available option for this violation.

(applying § 3161(j)(3)); *Valentine*, 783 F.2d at 1415 (applying § 3161(j)(1); *see United States v. Walker*, 255 F.3d 540, 542 (8th Cir. 2001) (citing cases from other circuits and holding that dismissal of the indictment is not a remedy for violation of § 3161(j)(2)). Similarly, the 9th Circuit has also held that failure to meet the notice requirement of the IAD is not grounds for dismissal. *United States v. Lualemaga*, 280 F.3d 1260, 1265 (9th Cir. 2002) ("[W]e hold that dismissal of an indictment is not an available form of relief where the notice requirement of the IAD is violated, even when that violation is attributable to the receiving State, here the United States.").

Here, Defendant argues that "[b]ecause the prison counselor who served Mr. Rodvelt the detainer failed to advise him of his rights, and failed to follow the statutory requirements, Mr. Rodvelt did not sign the detainer and did not assert his speedy trial rights." Def.'s Mot. 40. This argument fails for two reasons. First, even if the Government or Arizona DOC violated the notice provision of the STA or the IAD, for the reasons discussed above, dismissal is not warranted. Second, Defendant's argument fails because, as noted above, the Court finds that Corrections Officer Kaylor notified Defendant of his rights, and any lack of notice is due to Defendant's refusal to read the paperwork. Defendant testified that he told Corrections Officer Kaylor that he refused to sign the paperwork without counsel and that, despite having successfully requested assistance in obtaining counsel in the past, he never followed up or inquired further. Evid. Har. 187–88, 195. Defendant does not get a windfall for adopting an ostrich policy. Any lack of notice is, at best, because of Defendant's own negligence. The Motion to Dismiss based on the violation of the STA and the IAD is denied.

////

////

## II.   Sixth Amendment Speedy Trial Claim

Defendant also argues that the Government's delay in bringing him to trial violated his Sixth Amendment right to a speedy trial. Def.'s Mot. 13. The Speedy Trial Clause of the Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. A criminal investigation does not trigger a person's speedy trial rights. *United States v. MacDonald*, 456 U.S. 1, 9 (1982). Rather, the right to a speedy trial arises after an indictment. *United States v. Gregory*, 322 F.3d 1157, 1162 (9th Cir. 2003). In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court set out a four-factor test for determining whether a delay in bringing a person facing charges to trial violates the Sixth Amendment. A court must balance (1) the length of delay, (2) the reason for the delay, (3) the degree of the defendant's assertion of his right, and (4) the prejudice to the defendant. *Id.* [N]one of the four factors identified above [are] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Id.* at 533. Rather, the trial court must engage in a balancing test. *United States v. Tanh Huu Lam*, 251 F.3d 852, 856 (9th Cir. 2001). For the reasons discussed below, the *Baker* balance tips in favor of the Government.

### A.  The Length of the Delay

As to the first factor, "the length of the delay is to some extent a triggering mechanism." *Baker*, 407 U.S. at 530. Defendant "must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial." *Doggett v. United States*, 505 U.S. 647, 652 (1992) (internal quotation marks and citation omitted). "If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond" what is reasonably necessary for the government to prepare

for trial given the complexity of the charges. *Id.* "To take but one example, the delay that can be

tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy

charge." *Barker*, 407 U.S. at 531. "Although there is no bright-line rule, courts generally have

found that delays approaching one year are presumptively prejudicial." *Gregory*, 322 F.3d at

1161–62 (footnote omitted). The "delay is measured from 'the time of the indictment to the time

of trial.'" *Gregory*, 322 F.3d at 1162 (quoting *United States v. Sears, Roebuck & Co.*, 877 F.2d

734, 739 (9th Cir. 1989)).

       Here, because the Sixth Amendment is triggered when the government files charges,

Defendant's arguments regarding the pre-indictment delay are without merit. *See MacDonald*,

456 U.S. at 8 ("The Sixth Amendment right to a speedy trial is thus not primarily intended to

prevent prejudice to the defense caused by passage of time [pre-indictment]; that interest is

protected primarily by the Due Process Clause and by statutes of limitations."). Because

Defendant's September 8, 2018 arrest was not a ruse between state and federal officials,

Defendant's Sixth Amendment speedy trial rights began when he was federally indicted on

October 2, 2019 and extend approximately two-and-a-half years to the filing of the present

motion. Def.'s Mot. 17. While Defendant's charges are certainly more complex than that of an

ordinary street crime, such a delay is presumptively prejudicial, warranting further inquiry into

the *Barker* factors. Although this first factor weighs in Defendant's favor, the remaining *Baker*

factors weigh against a finding of a constitutional violation.

      **B. The Reason for the Delay**

       "Closely related to length of delay is the reason the government assigns to justify the

delay." *Barker*, 407 U.S. at 531. For example, on one end of the spectrum, an intentional delay

"to hamper the defense should be weighted heavily against the government." *Id.* On the other end

of the spectrum, "a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.* More neutral reasons, such as the government's negligence or confusion in proceeding to trial weigh slightly against the government. *Id.*; *see United States v. Mendez*, No. 3:07-CR-492, 2012 WL 3061899, at *6 (D. Or. July 26, 2012). And finally, the defendant's requests for continuances or an express waiver of speedy trial rights weigh against the defendant. *Lam*, 251 F.3d at 857–58.

Here, there are two distinct delays that the Court must consider. First, is the sixth-month delay from the October 2, 2019 indictment to Defendant's receipt of notice of the federal charges on April 8, 2020.[8] Defendant cannot be expected to demand a speedy trial without knowledge of the charges against him. Defendant was in Arizona's custody when indicted but the Government waited until December 30, 2019 to file a detainer and notice request. At the evidentiary hearing, the Government admitted that "[t]here was confusion between the FBI and the U.S. Attorney's Office who does this paperwork." Evid. Hear. 217. After receiving the request from the Government, Arizona DOC apparently took no action and only notified Defendant after the Government made a second request. The Government bears the responsibility for this delay. However, there is no evidence that this was a deliberate attempt to thwart Defendant's ability to mount a defense. Rather, the reason for the delay appears to be confusion or negligence on the part of the Government. The first delay weighs only slightly against the Government.

The second delay runs from Defendant's receipt of notice on April 8, 2020 to his request for a continuance on April 14, 2022. The Court finds that the Government had credible reasons for continuing its investigation such as the complexity of the case and other practical considerations. For example, Special Agent Gray testified that in his twenty-eight-year career

---

[8] Defendant disputes that he was notified of his speedy trial rights on April 8, 2019. However, for the reasons discussed above, the Court finds that Defendant received adequate notice.

with the FBI, this was only the second time that he had encountered improvised explosive

devices. Evid. Hear. 27. And when Special Agent Gluesemkamp took over the role of lead

investigator in July 2019, following Special Agent Gray's retirement, he conducted a

comprehensive review and identified additional areas in need of investigation. Evid. Hear. 66.

Although there is evidence that Special Agent Grey was itching to bring Defendant to trial, the

decision of when to bring a case to trial is a prosecutorial decision, made at the prosecutor's

discretion.  The Court finds that the Government demonstrated that it had legitimate reasons for

continuing the investigation, and there is no evidence that the delay was made in bad faith.

Overall, the reasons for the delay weigh against a finding of a violation of the Speedy Trial

Clause of the Sixth Amendment.

### C.  Defendant's Assertion of His Speedy Trial Right

On the third factor, because Defendant did not demand a speedy trial, the scale continues

to tip away from finding a constitutional violation. While failure to assert the speedy trial right

does not amount to waiver of the right, "failure to assert the right will make it difficult for a

defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532. "The Speedy

Trial Clause primarily protects those who assert their rights, not those who acquiesce in the

delay-perhaps hoping the government will change its mind or lose critical evidence." *United

States v. Aguirre*, 994 F.2d 1454, 1457 (9th Cir. 1993). The Supreme Court has held that the

third factor weighs heavily against a defendant who was aware of the indictment but chose not to

assert his right. *Doggett*, 505 U.S. at 653.

Defendant's Sixth Amendment speedy trial rights began after he was indicted on October

2, 2019. His conflicting statements to the judge at the September 11, 2018 revocation of bond

hearing, expressing a preference to be taken into federal custody, does not amount to a demand

for a speedy trial. If nothing else, that Defendant had yet to be federally arrested, let alone charged with a federal offense, renders those contradictory statements—made not to a federal prosecutor, but to a state court trial judge—irrelevant to any Sixth Amendment determination. Defendant was notified of his right in April 2020 and waited over two years to assert that right. The third factor weighs heavily against Defendant.

### D. Prejudice Because of the Delay

Regarding the fourth factor, "affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett*, 505 U.S. at 655. "[W]e generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* "The court must weigh the reasons for and the extent of the delay against the evidence of actual prejudice." *Mendez*, 2012 WL 3061899, at *7; *citing Doggett*, 505 U.S. at 656–58. "[W]hen the government has been negligent and the delay does not far exceed the minimum time required to trigger the full *Barker* inquiry, we must consider the amount of delay in relation to particularized prejudice." *Gregory*, 322 F.3d at 1163 (requiring showing of actual prejudice despite twenty-two-month delay caused by government's negligence) (internal quotation marks omitted). "Actual prejudice can be shown in three ways: oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired." *Lam*, 251 F.3d at 859 (quotation marks omitted). The impairment of the accused's defense is the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

Here, Defendant argues that the delay resulted in the destruction of valuable exculpatory evidence at the Oregon property. Def.'s Mot. 27. After hearing details about this evidence on an *ex parte* basis, the Court is not convinced that the delay substantially prejudiced Defendant's

ability to mount a defense. Defendant's evidentiary concerns appear to the Court to be analogous to similar concerns regarding access to evidence faced by nearly every criminal Defendant. Defendant also argues that the delay prejudiced him because police records relating to the September 2018 events in Arizona have been destroyed. Def.'s Mot. 27. However, Defendant was notified of the charges against him in April of 2020 and took no action. Because Defendant waited until June of 2022 to request the police records, the blame for any prejudice suffered by the destruction of these records does not lie with the Government. Defendant's next argument, that the delay in receiving discovery has prejudiced him, is equally unavailing. The Court is convinced that the Government made a good faith effort to produce discovery relevant to this motion in a timely manner. The Court finds that the delay has not caused a substantial impairment in Defendant's ability to prepare his defense.

Regarding oppressive pretrial incarceration, Defendant was subject to harsher conditions of imprisonment in Arizona because of the federal detainer. Corrections Officer Kaylor testified that when a felony detainer for an inmate is received, the inmate is served with the paperwork and then moved "up in custody from minimum to medium custody or higher, depending on the charges." Evid. Hear. 11. As previously discussed, due to the Government's negligence or confusion, Defendant was not notified of the charges against him until approximately six months after the indictment. Accordingly, the Government's delay seems to have benefited, rather than prejudiced, Defendant. Once Defendant was notified of the charges against him, he had the option to assert his right to a speedy trial, which he chose not to do. Any prejudice caused by the Government's delay does not amount to a constitutional violation. After tallying up the four *Baker* factors, the Court concludes that the Government did not violate Defendant's Sixth Amendment right to a speedy trial.

17 – ORDER

## <u>CONCLUSION</u>

For the above reasons, Defendant's Motion to Dismiss (ECF No. 40) is DENIED.

IT IS SO ORDERED.

DATED this 5th day of January, 2023.


_s/Michael J. McShane_____
Michael J. McShane
United States District Court

18 – ORDER